**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | |
|---|---|
| LISA ROSS, individually, and on behalf of all others similarly situated, | |
| Plaintiff, | **Civil Action No.:** 2:21-cv-00168 |
| v. | **JURY TRIAL DEMANDED** |
| NAVYARMY COMMUNITY CREDIT UNION, and DOES 1-5, | |
| Defendant. | |

## I    CLASS ACTION COMPLAINT

Plaintiff Lisa Ross ("Plaintiff"), by her attorneys, hereby brings this class and representative action against NavyArmy Community Credit Union and DOES 1 through 5 (collectively "NavyArmy" or "Defendant").

## II    NATURE OF THE ACTION

1.      All allegations herein are based upon information and belief except those allegations which pertain to Plaintiff or counsel. Allegations pertaining to Plaintiff or counsel are based upon, *inter alia*, Plaintiff or her counsel's personal knowledge, as well as Plaintiff or her counsel's own investigation. Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.      Plaintiff has brought this class and representative action to assert claims in her own right, and as the class representative of all other persons similarly situated. NavyArmy wrongfully, unilaterally and without warning, withdrew money from Plaintiff and the Class

1

Members' share draft ("checking") accounts though not authorized to do so. [1] NavyArmy falsely claimed that the funds it unilaterally took from Plaintiff's account were properly assessed Non-Sufficient Funds ("NSF") fees (a fee for a transaction that was returned unpaid) or overdraft fees (a fee for a transaction item that was covered and paid by NavyArmy on behalf of Plaintiff). Though NavyArmy was authorized by its contract with Plaintiff to assess only one fee per transaction item, it instead assessed multiple NSF fees for the same item, or an NSF fee followed by an overdraft fee on the same item.[2] These actions violated its contracts and disclosures with Plaintiff and the putative class.

3.    This class action seeks monetary damages, restitution, and injunctive relief as a result of, *inter alia*, NavyArmy's policy and practice of unlawfully assessing and unilaterally collecting NSF fees as set forth herein, in violation of its contract(s) with Plaintiff and the class and equities.

### III    PARTIES

4.    Plaintiff Lisa Ross is a resident of Corpus Christi, Texas, and a citizen of the State of Texas and has been a member of NavyArmy at all relevant times.

5.    Based on information and belief, NavyArmy does business as NavyArmy Community Credit Union, with its headquarters located in Corpus Christi, Texas, and branches located throughout the state of Texas. NavyArmy is chartered with Texas Credit Union Department as a community credit union. Therefore, NavyArmy is deemed to be a citizen of the State of Texas.

---

[1] Share draft account is a credit union's formal nomenclature for what is more commonly known as a "checking" account at banks.

[2] For ease of reference, this Complaint will refer to either of these circumstances as charging "multiple NSF fees" on the same transaction, as there are some cases when NavyArmy covers the item the second time it is submitted and other times when it does not.

6.      Without limitation, defendants DOES 1 through 5, include agents, partners, joint ventures, subsidiaries and/or affiliates of Defendant and, upon information and belief, also own and/or operate Defendant's branch locations. As used herein, where appropriate, the term "Defendant" is also inclusive of defendants DOES 1 through 5.

7.      Plaintiff is unaware of the true names of defendants DOES 1 through 5. Defendants DOES 1 through 5 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against defendants DOES 1 through 5 when the true names are ascertained, or as permitted by law or the Court.

8.      There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that they effectively operate as a single enterprise, or are mere instrumentalities of one another.

9.      At all material times herein, each defendant was the agent, servant, co-conspirator and/or employer of each of the remaining defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants, and ratified and approved the acts of the other defendants. However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

10.     Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was

3

actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

11.     As to the conduct alleged herein, each act was authorized, ratified or directed by Defendant's officers, directors, or managing agents.

## IV     JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this case pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the aggregated claims of the individual class members exceed the sum of $5,000,000, exclusive of interest and costs; there are more than 100 putative class members defined below; and there are numerous members of the proposed class who are citizens of a state different from Defendant.

13.     Venue is proper in this District, among other reasons, pursuant to 28 U.S.C. § 1391(b), because Defendant entered into its contract with Plaintiff in this District; Defendant is headquartered in this District; Defendant breached its contract in this district; Defendant regularly conducts business in this District; and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District. Venue is proper in this division because Plaintiff resides in the division; Plaintiff's account is held in this division; and a substantial part of the events and omissions giving rise to the claims asserted herein occurred in this division.

## V     BACKGROUND

## A.     DEFENDANT NAVYARMY COMMUNITY CREDIT UNION

14.     NavyArmy is a credit union with locations in several counties across southern Texas. To join NavyArmy, members are not required to live in Texas. Instead, when joining,

members are only required to either live, work, worship or go to school in specified Texas counties.

15.     According to its website, NavyArmy has approximately 195,000 members. Further, its financial filings indicate that it holds assets of approximately $3.7 billion. On its website, NavyArmy describes itself as offering "friendly, small-scale service" and "great tools for growing your money."[3] It markets and sells itself as superior to banks, in no small part, through claims that it is not motivated by profit, but instead by service to its members. In fact, it states that it is "ready to serve" and that it "answer[s] to members, not shareholders" so members enjoy a variety of benefits including "low or no fees on many services."[4] As will be discussed, that statement is false relating to its overdraft practices.

## B.     CHECKING ACCOUNTS DEFENDANT OFFERS TO MEMBERS

16.     One of the main services NavyArmy offers to members is a share draft, or checking account, where members can deposit and withdraw their money. The checking account can increase or be credited in a variety of ways, including automatic payroll deposits; electronic deposits; incoming transfers; deposits at the branch; and deposits at ATM machines. Debits decreasing the amount in the checking account can be made by using a debit card for purchases of goods and services (point of sale purchases) that can be one-time purchases or recurring automatic purchases; through withdrawal of money at an ATM; or by electronic purchases. Additionally, some of the other ways to debit the account include writing checks; issuing electronic checks; scheduling Automated Clearing House (ACH) transactions (which can include recurring automatic payments or one-time payments); transferring funds; and other types of

---

[3]See NavyArmy webpage, https://www.navyarmyccu.com/ [last viewed on July 15, 2021].

[4]See NavyArmy webpage, https://www.navyarmyccu.com/about/membership/ [last viewed July 15, 2021].

transactions that debit from a checking account. As of December 31, 2020, NavyArmy reported

holding 109,381 checking accounts with a total balance of $747,681,695.

## C.   CHECKING ACCOUNT OVERDRAFT AND NSF FEES GENERATE SIGNIFICANT PROFIT FOR NAVYARMY

17.    In connection with its processing of debit transactions (debit card, ATM, check,

ACH, and other similar transactions), NavyArmy assesses overdraft fees and/or NSF fees to

member accounts when it claims to have determined that an account has been overdrawn.

18.    Fees constitute a significant portion of NavyArmy's profits each year. In 2020,

NavyArmy reported earning over $20 million in "non-interest fee income." A sizeable amount of

this fee income is believed to accrue from overdraft and NSF fees, including the improper repeat

NSF fees Plaintiff alleges in this Complaint.

## D.   THE DETRIMENTAL EFFECT OF OVERDRAFT AND NSF FEES

19.    This case is about when and under what circumstances NavyArmy may charge

certain NSF fees.

20.    The underlying principle for charging overdraft fees is that when a customer has

insufficient funds, a financial institution may cover a transaction for the member by advancing

its own funds to pay for the transaction. In that circumstance, the financial institution may charge

the member a *contracted* fee, provided that charging the fee is not prohibited by some legal

regulation. This fee often constitutes very expensive credit. According to the FDIC:

> For almost all study population banks operating an automated
> overdraft program, the main fee associated with the program was
> an NSF usage fee. Usage fees reported by these banks ranged from
> $10 to $38; the median fee was $27, charged on a per-transaction
> basis in almost all cases. **In this context, a $27 fee charged for a
> single advance of $60 that was repaid in two weeks roughly
> translated into an APR of 1,173 percent.** Many surveyed banks
> (24.6 percent) assessed additional fees on accounts that remained

in negative balance status in the form of flat fees or interest charged on a percentage basis. [5]

21.    Financial institutions can also charge a *contracted* NSF fee when a customer's checking account purportedly lacks sufficient funds to cover an item and the financial institution opts to return the transaction item unpaid rather than cover it. Although there is very little, if any, risk to financial institutions when they return an item unpaid, they still charge customers a very expensive fee for this purported "service."

22.    The Consumer Financial Protection Bureau ("CFPB") has noted that, as opposed to overdraft program coverage, financial institutions' return of items as unpaid, which often results in the assessment and collection of insufficient funds fee charges (which the CFPB refers to as "NSF fees"), confers little, if any, benefit to consumers:

> An important consumer outcome of any overdraft program is the percentage of negative transactions that are paid (*i.e.*, result in overdrafts) or returned unpaid (*i.e.*, were NSFs). Paying overdraft transactions may confer some benefit (in exchange for the associated fees and other costs) to consumers by helping them make timely payments and avoid late penalty fees and/or interest charges from a merchant or biller. **In contrast, returning an item generally confers little benefit to the consumer (other than perhaps deterring future overdrafting and any subsequent consequences) and can result in an NSF fee as well as additional related fees, such as a returned check fee charged by the institution to whom the check was presented or a late fee charged by the entity to whom payment was due**. [6]

23.    Overdraft and NSF fees constitute a primary revenue generator for banks and credit unions.  According to one banking industry market research company, Moebs Services, banks and

---

[5] FDIC Study of Bank Overdraft Programs, 2008, https://www.fdic.gov/bank/analytical/overdraft/fdic138_report_final_v508.pdf [last viewed July 15, 2021] (emphasis added).
[6] CFPB, CFPB Study of Overdraft Programs (June 2013), p. 26 (internal footnote omitted) (emphasis added), https://files.consumerfinance.gov/f/201306_cfpb_whitepaper_overdraft-practices.pdf [last viewed July 15, 2021].

credit unions in 2018 alone generated an estimated $34.5 billion on overdraft fees.[7] And according to a 2010 report by Georgetown University Law Professor Adam Levitin, overdraft fees comprise 6% to 7% of the gross revenue of credit unions.[8]

24.    While credit unions portray themselves as more overdraft and fee friendly than banks—and that may have been historically true—it is not true now. Moebs Services reported that 2018 credit union overdraft revenue jumped $500 million, even as bank overdraft revenue declined by $400 million. Further, the same study showed that credit unions generated significantly more revenue per member in service fees than banks did.[9] And none of this is any surprise, because from 2000 to 2017, the average credit union overdraft fee increased from $15 to $29.[10]

25.    NavyArmy's financial filings and practices reveal that it has followed these trends to the letter. Contrary to the fee-friendly persona NavyArmy promotes on its website, NavyArmy charges an NSF fee of $30 per item, higher than the average usually charged at comparable institutions. Even if NavyArmy had been properly charging NSF fees, the $30 fee bears no relation to its minute risk of loss or cost for administrating its overdraft services. Nevertheless, the fee's practical effect is to charge those who pay it for overdraft purposes an interest rate with

---

[7] Moebs Services, *Overdraft Revenue Inches Up in 2018* (Mar. 27, 2019), http://www.moebs.com/Portals/0/pdf/Articles/Overdraft%20Revenue%20Inches%20Up%20in%202018%200319-1.pdf?ver=2019-03-27-115625-283 [last viewed July 15, 2021].

[8] *Overdraft Regulation: A Silver Lining In The Clouds?* (Filene Research Institute 2010), https://ssrn.com/abstract=1544888 [last viewed July 15, 2021].

[9] Credit Union Times, *Overdraft Revenue Surges at Credit Unions: Moebs* (Jan. 7, 2019), https://www.cutimes.com/2019/01/07/overdraft-revenue-surges-at-credit-unions-moebs/ [last viewed July 15, 2021].

[10] MarketWatch, *The Average Credit Union Overdraft Fee Has Almost Doubled Since 2000* (March 27, 2017) https://www.marketwatch.com/story/credit-unions-charge-almost-as-much-as-major-banks-in-overdraft-fees-2017-03-24 [last viewed July 15, 2021].

an APR in the thousands. And the effects of that simply compound when NavyArmy charges multiple $30 NSF fees on a single transaction.

26.    Accordingly, the overdraft and NSF fee is a punitive fee rather than a service fee, which makes it even more unfair because most account overdrafts are accidental and involve a small amount of money in relation to the fee. In a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their accounts by mistake.[11] More than 60% of the transactions that resulted in a large overdraft fee were for less than $50.[12] More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft program, and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than being charged a very large fee.[13]

27.    Finally, the financial impact of these fees falls on the most vulnerable among the banking population with the least ability to absorb them. Younger, lower-income, and non-white account holders are among those most likely to be assessed overdraft fees.[14] A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old. More than 50% of the customers assessed overdraft fees earned under $40,000 per year. And non-whites are 83% more likely to pay an overdraft fee than whites.[15]

_____

[11] Pew Charitable Trust Report, *Overdraft America: Confusion and Concerns about Bank Practices*, at p. 4 (May 2012), https://www.pewtrusts.org/en/research-and-analysis/issue-briefs/2012/05/03/overdraft-america-confusion-and-concerns-about-bank-practices [last viewed July 15, 2021].

[12] (Pew Charitable Trust Report, *Overdrawn*, at p. 8 (June 2014), https://www.pewtrusts.org/-/media/assets/2014/06/26/safe_checking_overdraft_survey_report.pdf [last viewed July 15. 2021].)

[13] *Id.* at pgs. 5, 10.

[14] *Id.*, at p. 1.

[15] *Id.,* at pgs. 3-4.

28.     On top of all this, the practice of charging multiple NSF fees on the same

transaction is a lucrative one.  The effect is to double (or more) the profit derived from any single

transaction that the financial institution considers an "overdraft." But to do so is unfair and, more

importantly for the purposes of Plaintiff's claims, unauthorized by NavyArmy's contracts with

its members. Those contracts do not disclose or permit the charging of multiple NSF fees based

on the same transaction with the same merchant. Nor do they permit charging an NSF fee

followed by an overdraft fee on the same item if the item is paid into overdraft on a second

presentment. Instead, the agreements identify an insufficient funds fee as being singular on a per

transaction, or item, basis.

**E.      HOW SOME BANKS AND CREDIT UNIONS HAVE DISCLOSED THAT A
         SINGLE NSF ITEM CAN RESULT IN MULTIPLE OVERDRAFT FEES**

29.     Unlike NavyArmy, other banks and credit unions have been able to properly

contract and disclose the practice of charging multiple fees for the representation of the same

item.  For example, Air Academy Federal Credit Union clearly states: an NSF fee is "$32.00 per

presentment."

30.     Central Pacific Bank contracts unambiguously:

> Items and transactions (such as, for example, checks and electronic
> transactions/payments) returned unpaid due to insufficient/non-
> sufficient ("NSF") funds in your account, may be resubmitted one
> or more times for payment, and a $32 fee will be imposed on you
> each time an item and transaction resubmitted for payment is
> returned due to insufficient/nonsufficient funds.

31.     Delta Community Credit Union states its NSF fee is "$35 per presentment."

Further, in its Account Agreement, Delta unambiguously states as follows:

> The Credit Union reserves the right to charge you an
> overdraft/insufficient funds fee if you write a check or initiate an
> electronic transaction that, if posted, would overdraw your
> Checking Account.  Note that you may be charged an NSF fee

each time a check or ACH is presented to us, even if it was
previously submitted and rejected.

32.    Glendale Federal Credit Union lists its NSF fee as "$30 per presentment."

33.    First Financial Bank contracts unambiguously:

Merchants or payees may present an item multiple times for
payment if the initial or subsequent presentment is rejected due to
insufficient funds or other reason (representment).  Each
presentment is considered an item and will be charged
accordingly."

34.    First Northern Credit Union lists its NSF fee as "$22.00 per each presentment and

any subsequent presentment(s)."  Further, in its Account Agreement, First Northern

unambiguously states as follows:

You further agree that we may charge a NSF fee each time an item
is presented for payment even if the same item is presented for
payment multiple times.  For example, if you wrote a check to a
merchant who submitted the payment to us and we returned the
item (resulting in a NSF fee), the merchant may re-present the
check for payment again.  If the second and any subsequent
presentments are returned unpaid, we may charge a NSF fee for
each time we return the item.  You understand this means you
could be charged multiple NSF fees for one check that you wrote
as that check could be presented and returned more than once.
Similarly, if you authorize a merchant (or other individual or
entity) to electronically debit your account, such as an ACH debit,
you understand there could be multiple submissions of the
electronic debit request which could result in multiple NSF fees.

35.    Liberty Financial states its NSF fee is "27.00 per presentment."

36.    Los Angeles Federal Credit Union lists its NSF fee as "$29 per presentment."

37.    Members First Credit Union states:

We reserve the right to charge an Non-Sufficient Funds Fee (NSF
Fee) each time a transaction is presented if your account does not
have sufficient funds to cover the transaction at the time of
presentment and we decline the transaction for that reason. This
means that a transaction may incur more than one Non-Sufficient
Funds Fee (NSF Fee) if it is presented more than once…we reserve

the right to charge a Non-Sufficient Funds (NSF Fee) for both the original presentment and the representment . . . .

38.    Meriwest Credit Union lists its fee as "$35.00/item per presentment."

39.    Partners 1st Federal Credit Union states:

Consequently, because we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee for any given item.  Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

40.    Regions Bank states:

If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our charge for items drawn against insufficient or unavailable funds, whether or not we pay the item.  If any item is presented again after having previously been returned unpaid by us, you agree to pay this charge for each time the item is presented for payment and the balance of available funds in your account is insufficient to pay the item.

41.    Tyndall Federal Credit Union lists its NSF fee as "$28.00 per presentment (maximum 5 per day)."

## VI    FACTUAL ALLEGATIONS AGAINST NAVYARMY

42.    At all relevant times, NavyArmy has had an overdraft and NSF fee program in place which, *inter alia*, is: 1) contrary to the express and implied terms of its contracts with customers; 2) contrary to NavyArmy's representations about NSF fees; and 3) contrary to NavyArmy members' expectations regarding the assessment of such fees.

43.    NavyArmy improperly charges multiple fees for the same electronic transaction or item.  NavyArmy charges a $30 fee when an electronic transaction or item is first processed for payment and NavyArmy determines that there is not enough money in the account to cover

the transaction.  NavyArmy then charges an *additional* NSF fee if the same item is presented for processing again by the payee.

44.     NavyArmy's practice of charging additional NSF for the representment of the same item violates the Terms and Conditions it imposes upon its members.  (The Terms and Conditions ("Account Agreement") are attached hereto as Ex. 1.)  The Account Agreement constitutes a uniform written contract between NavyArmy and Plaintiff or other Class Members.

45.     But the Account Agreement does not permit NavyArmy's practice of charging multiple NSF fees on the same item.  Instead, NavyArmy provides in the Account Agreement that "if an item is presented without sufficient funds in your account to pay it, we may, at our discretion, pay the item (creating an overdraft) or return the item for insufficient funds." In such a case, the Account Agreement provides that "an insufficient funds charge will apply if paid or returned." The Account Agreement thus provide for a single insufficient funds charge for each item, not multiple charges for the same item.

46.     Furthermore, although Plaintiff is unaware at the time whether NavyArmy's Fee Schedule was ever served on Class Members in a manner required to make it effective, and this will require discovery, the Fee Schedule also refers to a singular "Insufficient Funds Charge (FOR ALL ITEMS)" of $30.  (The Fee Schedule is attached hereto as Ex. 2.)

47.     And other materials provided to Plaintiff by NavyArmy confirm that it was supposed to charge only a single NSF fee per item.  For instance, in a brochure about the overdraft program, the result is that a transaction made without "sufficient funds in theaccount" will be "declined or returned unpaid." When that happens, NavyArmy states that it "may charge an Insufficient Funds Charge fee" and that the member "may incur additional fees from the payee." But there is no provision for NavyArmy to charge multiple fees for the same transaction.

48.    NavyArmy's standardized contracts and disclosures misrepresented to members that it would only charge a single fee per item, when it actually charged multiple NSF fees on the same item. Further, because NavyArmy charged NSF fees improperly, and because NavyArmy's improper deduction of the additional improper $30 fee further decreased members' "balance" or "available balance," these charges likely generated even more NSF fees or overdraft fees to the account.

49.    Courts in various jurisdictions have recognized that when banks and credit unions charge multiple NSF fees on the same item while failing to clearly disclose such practice, it gives rise to claims and causes of action on a class wide basis.[16]

50.    Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts.

51.    Meanwhile, Plaintiff and the Class Members could not have reasonably anticipated the harm resulting from NavyArmy's practice throughout the class period because the Account Agreement only provided that NavyArmy would charge a single NSF fee for an item.

---

[16] *See e.g.*, *Morris v. Bank of America*, No. 3:18-cv-00157-RJC-DSC, 2019 WL 1274928 (W.D.N.C. March 29, 2019) (Order denying motion to dismiss allegations regarding improper repeat NSF claims); *Tannehill v. Simmons Bank*, No. 3:19-cv-140-DPM, Docket No. 23 (E.D. Ark., Oct. 21, 2019) (Order denying motion to dismiss repeat NSF claims); *Garcia v. UMB Bank NA*, No. 1916-CV01874 (Jackson Co., Missouri, Circuit Court, Oct. 18, 2019) (Order denying motion to dismiss repeat NSF claims); *Tisdale v. Wilson Bank and Trust*, No. 19-400-BC (Davidson Co. Tenn., Chancery Court, Oct. 17, 2019) (Order denying motion to dismiss repeat NSF claims); *Noe v. City National Bank of West Virginia,* Civil Action No. 3:19-0690 (S.D.W.V. Feb. 19, 2020) (Order denying motion to dismiss repeat NSF claims); *Ingram v. Teachers Credit Union*, Cause No. 49D01-1908-PL-035431 (Indiana Commercial Court, Marion County Superior Court) (Order denying motion to dismiss repeat NSF claims); *Perks, et al. v. TD Bank, N.A.,* Civil Action No. 18-CV-11176 (S.D.N.Y. Mar. 17, 2020) (Order denying motion to dismiss breach of contract claim for repeat NSF fees); and *Coleman, et al. v. Alaska USA Federal Credit Union,* Civil Action No. 3:19-cv-0229-HRH (D. Alaska Apr. 14, 2020) (Order denying motion to dismiss plaintiffs' breach of contract and good faith and fair dealing claims for repeat NSF fees).

52.     Therefore, Plaintiff, on behalf of herself and all others similarly situated, seeks relief as set forth below.

## A.     PLAINTIFF HAS BEEN DAMAGED AND HAS STANDING TO BRING THIS LAWSUIT

53.     Plaintiff and the Class Members were harmed by NavyArmy's policy and practice of charging an NSF fee more than once for the same "item."  By doing so, NavyArmy breached its contracts with Plaintiff and the absent Class Members.  It will be necessary to obtain NavyArmy's records to determine each instance of such a wrongful NSF fee; however, Plaintiff has already uncovered some examples.  Specifically, on July 1, 2019, NavyArmy charged Plaintiff an "Insufficient Funds Charge" totaling $30 after Plaintiff initiated a Paypal transfer for $21.64. After initially deducting $21.64 from Plaintiff's account for the transaction, NavyArmy rejected the transaction, recredited Plaintiff's account for $21.64, then charged Plaintiff $30 as an Insufficient Funds Charge.  Six days later, the payee again made a request for payment, and again the bank refused to make payment on the transaction. However, despite the fact that Plaintiff had already incurred one insufficient funds charge, NavyArmy charged Plaintiff a second $30 fee. In charging the second $30 fee for the same item, NavyArmy increased its fee profits from $30 to $60.  Yet the second fee assessed was not authorized by the Account Agreement or Fee Schedule which provide for only one fee to be assessed on an item.

54.     NavyArmy's assessment, and unilateral taking of, improper NSF fees further reduced the balance and amount of funds in members' accounts, resulting in and aggressively causing subsequent, otherwise non-NSF transactions to be improperly treated as transactions for which NavyArmy assessed further NSF fees.  A complete evaluation of NavyArmy's records is necessary to determine the full extent of Plaintiff's and Class Members' harm from this practice.

## VII    CLASS ACTION ALLEGATIONS

55.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

56.    Plaintiff brings this case, and each of the respective causes of action, as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(1), (b)(2) and (b)(3) on behalf of the following Class.

57.    The "Class" is composed of the following:

**The Repeat NSF Class:**

> **All United States residents who have or have had accounts with NavyArmy who incurred more than one NSF fee followed by an overdraft fee or another NSF fee for the same item during the period beginning four years preceding the filing of this Complaint and ending on the date the Class is certified.**

58.    Excluded from the Classes are: 1) any entity in which NavyArmy has a controlling interest; 2) officers or directors of NavyArmy; 3) this Court and any of its employees assigned to work on the case; and 4) all employees of the law firms representing Plaintiff and the Class Members.

59.    This action has been brought and may be properly maintained on behalf of each member of the Class pursuant to Federal Rules of Civil Procedure, Rule 23.

60.    **Numerosity (Federal Rules of Civil Procedure, Rule 23(a)(1))** – The members of the Class are so numerous that joinder of all members would be impracticable.  While the exact number of Class Members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes based on the percentage of customers that are harmed by these practices with banks and credit unions with similar practices, that the Class is likely to include thousands of members.

61.     Upon information and belief, NavyArmy has databases, and/or other documentation, of its members' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of NavyArmy's members has been harmed by its practices and thus qualify as a Class Member.  Further, the Class definition identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice through mail or email, alternative proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other publications.

62.     **Commonality (Federal Rules of Civil Procedure, Rule 23(a)(2))** – This action involves common questions of law and fact.  The questions of law and fact common to both Plaintiff and the Class Members include, but are not limited to, the following:

- whether, pursuant to the Account Agreement, NavyArmy contracted that it would only charge "a" single fee for an NSF "item" rather than charge repeat NSF fees for the same "item;"

- whether NavyArmy breached the Account Agreement by assessing repeat fees on the same "item;"

- whether the language in the Account Agreement and/or Fee Schedule is ambiguous; and

- whether NavyArmy is liable for breach of the covenant of good faith and fair dealing, unjust enrichment and money had and received.

63.     **Typicality (Federal Rules of Civil Procedure, Rule 23(a)(3))** – Plaintiff's claims are typical of all Class Members.  The evidence and the legal theories regarding

NavyArmy's alleged wrongful conduct committed against Plaintiff and all of the Class Members are substantially the same because all of the relevant agreements between NavyArmy and its members were identical as to all relevant terms, and also because, *inter alia*, the challenged practice of charging members multiple fees for the same item was uniform for Plaintiff and all Class Members. Accordingly, in pursuing her own self-interest in litigating her claims, Plaintiff will also serve the interests of the other Class Members.

64.    **Adequacy (Federal Rules of Civil Procedure, Rule 23(a)(4))** – Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained competent counsel experienced in class action litigation to ensure such protection. There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate. Plaintiff and her counsel intend to prosecute this action vigorously.

65.    **Predominance and Superiority (Federal Rules of Civil Procedure, Rule 23(b)(3))** – The matter is properly maintained as a class action under Rule 23(b)(3) because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class Members. Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter. Because the injuries suffered by the individual Class Members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class Members to individually seek redress for NavyArmy wrongful conduct. Even if any individual person or group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. The class action device is preferable to individual litigation because it provides the benefits of unitary

adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Plaintiff and the Class Members will continue to suffer losses, thereby allowing NavyArmy's violations of law to proceed without remedy and allowing NavyArmy to retain the proceeds of its ill-gotten gains.

66.     Plaintiff's claims are typical of the other Class Members and that she will adequately represent the Class. This particular forum is desirable for this litigation because NavyArmy's headquarters are located in this District and the claims arose from activities that occurred largely in this District. Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

67.     Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members. Upon information and belief, NavyArmy's own business records and/or electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, Plaintiff anticipates using additional media and/or mailings.

68.     This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure in that without class certification and determination of

declaratory, injunctive, statutory and other legal questions within the class format, prosecution of separate actions by individual members of the Class will create the risk of:

- inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

- adjudication with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

69.    Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

- the interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

- the extent and nature of any litigation concerning the controversy already commenced by or against members of the Class;

- the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and,

- the difficulties likely to be encountered in the management of a class action.

## VIII    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (Breach of the Account Agreement)

70.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

71.     Plaintiff and each of the Class Members entered into the Account Agreement, attached hereto as Ex. 1.  The Account Agreement was drafted by and is binding on NavyArmy.

72.     Among other promises NavyArmy made in the Account Agreement, NavyArmy promised that it would assess only a single NSF fee for an unpaid, returned item due to purported insufficient funds when, in practice, it charged a $30 fee when an electronic transaction or item was first processed for payment and NavyArmy determined that there was not enough money in the account to cover the transaction, and then charged an *additional* NSF or overdraft fee if the same item was presented for processing again by the payee, even though the account holder took no action to resubmit the item for payment.

73.     NavyArmy's practice violates the Account Agreement, which provides only that NavyArmy can charge a singular "insufficient funds fee" for a single item. Yet NavyArmy wrongfully treated the representment of an item as a new and separate "item" justifying an additional NSF or overdraft fee in violation of the Account Agreement.

74.     For these reasons, the Account Agreement fails to accurately describe the circumstances when NavyArmy will charge Plaintiff and Class Members certain NSF (or overdraft) fees.

75.     Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms

and conditions of the Account Agreement, except for those they were prevented from performing or which were waived or excused by NavyArmy's misconduct.

76.    NavyArmy breached the terms of the Account Agreement by, *inter alia*, assessing multiple fees for the same electronic transaction or item.

77.    As a proximate result of NavyArmy's breaches, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## SECOND CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

78.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

79.    Plaintiff and each of the Class Members entered into the Account Agreement. The Account Agreement was drafted by, and is binding upon, NavyArmy.  In the agreement, NavyArmy promised it would only charge a single NSF fee for an item.  Yet NavyArmy assessed NSF (and/or overdraft fees) multiple times for the same electronic item.

80.    Further, good faith is an element of every contract.  Whether by common law or statute, all contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

81.     The material terms of the Account Agreement therefore include the implied covenant of good faith and fair dealing, whereby NavyArmy covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class Member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class Members' rights and benefits under the contracts.

82.     Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contracts, except for those they were prevented from performing or which were waived or excused by NavyArmy's misconduct.

83.     NavyArmy breached the implied covenant of good faith and fair dealing based, *inter alia*, on its practices of assessing multiple NSF fees for a single, unpaid returned item, or by assessing an overdraft fee on the same item that was previously assessed an NSF fee. NavyArmy could easily have avoided acting in this manner by simply changing the programming in its software to charge a fee only once per item.  Instead, NavyArmy unilaterally elected to and did program its software to charge multiple fees each time the same item was represented for payment by a merchant which would maximize its overdraft and NSF fee revenue.  In so doing, and in implementing its overdraft and NSF fee programs for the purpose of increasing and maximizing overdraft and NSF fees, NavyArmy executed its contractual obligations, including any discretion it had, in bad faith, depriving Plaintiff and the Class Members of the full benefit of the Account Agreement.

84.     As a proximate result of NavyArmy's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## THIRD CAUSE OF ACTION

### (Unjust Enrichment/Restitution)

85.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

86.    As a result of the wrongful misconduct alleged above, NavyArmy unjustly received millions of dollars in overdraft and NSF fees.

87.    Because Plaintiff and the Class Members paid the erroneous overdraft and NSF fees assessed by NavyArmy, Plaintiff and the Class Members have conferred a benefit on NavyArmy, albeit undeservingly.  NavyArmy has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.  Should it be allowed to retain such funds, NavyArmy would be unjustly enriched.  Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

## FOURTH CAUSE OF ACTION

### (Money Had and Received)

88.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

89.    NavyArmy has obtained money from Plaintiff and the Class Members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

90.    As a result, NavyArmy has in its possession money which, in equity, belongs to Plaintiff and the Class Members, and thus, this money should be refunded to Plaintiff and the

Class Members.  Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

## IX    **PRAYER**

WHEREFORE, PLAINTIFF and CLASS MEMBERS pray for judgment as follows:

1.    For an order certifying this action as a class action;

2.    For actual damages and restitution on all applicable claims and in an amount to be proven at trial;

3.    For an order requiring NavyArmy to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

4.    For an order enjoining the wrongful conduct alleged herein;

5.    For costs;

6.    For pre-judgment and post-judgment interest as provided by law; and

7.    For such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

PLAINTIFF, on behalf of herself and all others similarly situated, demands a jury trial with respect to all issue triable of right by jury.

DATED:  August 11, 2021.                    Respectfully submitted,

/s/ *Bruce W. Steckler*
Bruce W. Steckler
TX Bar No. 00785039
**STECKLER WAYNE COCHRAN**
**CHERRY PLLC**
12720 Hillcrest Road, Suite 1045
Dallas, Texas 75230
Telephone: (972) 387-4040
Facsimile: (972) 387-4041
bruce@swclaw.com

Richard D. McCune
CA Bar No. 132124*
rdm@mccunewright.com
David C. Wright, CA Bar No. 177468*
dcw@mccunewright.com
McCUNE WRIGHT AREVALO, LLP
3281 East Guasti Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

Emily J. Kirk, IL Bar No. 6275282*
ejk@mccunewright.com
McCUNE WRIGHT AREVALO, LLP
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone:  (618) 307-6116
Facsimile:  (618) 307-6161

Attorneys for LISA ROSS, individually, and
on behalf of all others similarly situated

*Pro Hac Vice applications to be submitted